# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 22-689V**

| | |
|---|---|
| LAURA WUNSCH,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: July 2, 2026 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Mitchell Jones, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING DAMAGES[1]

On June 17, 2022, Laura Wunsch filed a Petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered from a shoulder injury related to vaccine administration ("SIRVA") due to an influenza ("flu") vaccine administered on October 17, 2019. Petition at 1, ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters, and although Respondent ultimately conceded entitlement, the parties could not informally resolve damages.

For the reasons set forth below, and after hearing argument from the parties, I find that Petitioner is entitled to compensation in the amount of **$175,000.00, for actual pain**

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

**and suffering, and $271.95 in past unreimbursable expenses, for a total of $175,271.95.**

## I. Relevant Procedural History

Respondent filed a Rule 4(c) Report in May 2024 conceding that Petitioner was entitled to compensation in this matter, and I issued a ruling on entitlement in Petitioner's favor shortly thereafter. ECF Nos. 28, 29. The parties attempted to informally resolve damages but were unsuccessful, and filed briefs setting forth their competing views. ECF Nos. 43-45. I proposed that the parties be given the opportunity to argue their positions at a "Motions Day" hearing, at which time I would decide the disputed damages issues. ECF No. 46. The parties agreed and the hearing was held on June 26, 2026. ECF No. 47; Min. Entry, docketed June 29, 2026. During the hearing, I made an oral damages determination. This Decision memorializes those findings and determinations.

## II. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may consider prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in a specific case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the

proper amount of damages in this case."). And, of course, I may also rely on my own experience adjudicating similar claims.[3] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (2013).

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussions in Section II of *Matthews v. Sec'y of Health & Hum. Servs*., No. 22-1396V, 2025 WL 2606607, at *2-3 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

## III. Appropriate Compensation in this Matter

### A. Actual Pain and Suffering

In this case, awareness of the injury is not disputed. Petitioner was a competent adult with no impairments that would impact her consciousness of her injury. Therefore, I analyze principally the severity and duration of the injury. When performing this analysis, I review the record as a whole, including the medical records and declarations filed, all assertions made by the parties in written documents, and the parties' arguments during the expedited damages hearing.

The record shows that following her vaccination, Petitioner (age 56 when vaccinated) suffered a severe SIRVA causing her to report shoulder-related symptoms within twelve days of vaccination, and to seek treatment for approximately two years thereafter. At the time of her initial visit on October 29, 2019 (at the occupational health clinic at her place of employment), Petitioner rated her pain in the upper range of a ten-point scale (7/10) and reported she had been taking 1200mg of Advil daily "without relief." Ex. 3 at 79-80. Petitioner's reports of pain and severe mobility restrictions were corroborated on examination at that time – thus supporting a severe acute injury. *See id.*

Petitioner's subsequent treatment was fairly aggressive overall. Particularly relevant is her receipt of over-the-counter and prescription medications, three steroid injections, one MRI, x-rays, CTs, 30 PT sessions (both pre- and post-operative rounds),

---

[3] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

and two surgeries (one arthroscopic and one open arthroplasty/biceps tenodesis procedures), followed by a noted improvement in symptoms (with lingering effects that do not require ongoing care and are not entirely attributable to the subject vaccine injury, an issue to be discussed in more detail below). Additionally, Petitioner described moderate to severe pain throughout her early course of treatment, ranging in severity from 2-3/10 at best, but up to an 8/10 or 10/10 with activities. *See,* e.g., Ex. 3 at 87 (rating pain at 3-5/10 on November 20, 2019); *id.* at 133 (rating pain at 6/10 but range of 3-10/10 on December 6, 2019); *id.* at 174 (rating pain at 2-8/10 on January 7, 2020); Ex. 4 at 8 (rating pain at 3/10 on June 1, 2021). These facts are consistent with a severe injury course.

As noted above and discussed during the Motions Day hearing in this matter, however, while Petitioner's treatment for her left shoulder continued through January 2025 (with some year-long gaps in care), I do not conclude on this record that the overall course of treatment Petitioner experienced can *entirely* be attributed to her SIRVA, contrary to Petitioner's assertions.

Specifically, the record shows that Petitioner received consistent left shoulder treatment for about two years; she underwent her first surgery in March 2020 (an arthroscopic synovectomy and scarred synovial resection, subacromial decompression, debridement of glenoid and humeral head, subpectoral biceps tenodesis, and a SLAP repair, *see,* e.g., Ex. 3 at 272-73); she received a small to moderate amount of treatment with PT, pre- and post-surgery; and she had steroid injections when PT exacerbated her pain. *See,* e.g., Ex. 3 at 115, 503-05, 530-32; Ex. 5 at 38-145. Her subclinical findings on MRI (in January 2020, just three months post vaccination) resulted in findings commonly seen in Program SIRVA cases (i.e., bursitis – Ex. 3 at 167, 182-83). But her MRI also showed comorbid ailments, including fraying and tearing of the superior labrum (assessed as a SLAP tear), plus significant degenerative findings/osteoarthritis ("OA"). Ex. 3 at 182. These reflect conditions that could not be SIRVA-caused, even if the inflammation associated with the SIRVA initially exacerbated them.[4]

---

[4] *See,* e.g., *Lang v. Sec'y of Health & Hum. Servs.,* No. 17-995V, 2020 WL 7873272, at *13 (Fed. Cl. Spec. Mstr. Dec. 11, 2020) (finding that evidence of the existence of a rotator cuff tear does not *per se* preclude a finding that a Table SIRVA exists, but the "key questions is whether [the] petitioner's own clinical history indicates that [his] shoulder pathology wholly explains [his] symptoms independent of vaccination."). *Lang* also described a Health and Human Services-Centers for Disease Control joint study which found that rotator cuff tears were present in approximately 40% of a cohort of compensated SIRVA cases. *See* 2020 WL 7873272, at *13; *see also Grossman v. Sec'y of Health & Hum. Servs.,* No. 18-13V, 2022 WL 779666, at *17 (Fed. Cl. Spec. Mstr. Feb. 15, 2022) (citing the Atanasoff article relied upon in creating the SIRVA QAI, for the proposition that "MRI findings . . . such as rotator cuff tears, may have been present prior to vaccination and became symptomatic as a result of vaccination-associated synovial inflammation"); *accord* 42 C.F.R. § 100.3(c) (describing SIRVA as "an inflammatory reaction" within the musculoskeletal system of the shoulder). *Peka v. Sec'y of Health & Hum. Servs.,* No. 20-1099V, 2025 WL 551367, at *6 (Fed. Cl. Spec. Mstr. Jan. 15, 2025) (finding that a petitioner's upcoming shoulder surgery to treat bursitis *and* an age-related rotator cuff tear was not consistent with an ongoing vaccine-related injury, as the rotator cuff injury was found to be generalized and pre-existing, and the vaccine injury was thus not the predominant factor at play at the time of his surgery).

By July of 2020 – approximately four months after Petitioner's first left shoulder surgery – Petitioner admitted that she was "better than before surgery" but had ongoing pain, plus a new "clunking" with movement. Ex. 3 at 503. Petitioner's treating orthopedist thought Petitioner's clunking was "related to her known *shoulder arthritis* which is flared up after this work injury[,]" meaning her vaccination. *Id.* at 505 (emphasis added). This same treater reiterated in late November of 2020 that Petitioner was suffering from glenohumeral OA and "synovitis and *worsening of arthritis symptoms* after an influenza vaccination at work." *Id.* at 559 (emphasis added). Thus, the contemporaneous medical records demonstrate that at least some of Petitioner's vaccine-related shoulder symptoms were ongoing by late 2020, despite a concomitant worsening of her underlying OA.

Despite Respondent's contentions that Petitioner's SIRVA had resolved by the end of 2020/beginning of 2021, I find that Petitioner's ongoing symptoms were nonetheless *at least partially* related to Petitioner's original vaccine-related injury past that time. In February 2021, Petitioner reported worsening shoulder pain and her treaters noted that her "left shoulder pain and arthritis ha[d] progressed." Ex. 3 at 604. Interestingly, Petitioner also began complaining of a constellation of symptoms specific to the *right elbow* (in which she suffered a pre-existing ailment, i.e., epicondylitis, Ex. 2 at 237). *See id.* These elbow symptoms were considered by Petitioner's orthopedist and thought to be "secondary to compensation for left shoulder arthritis pain." *Id.* at 606. She received a steroid injection in the right elbow at that time. *See id.* Thus, Petitioner's right elbow issues, despite being in the opposite arm than her original vaccine-related injury, could reasonably be considered sequalae of her SIRVA as supported by her contemporaneous medical records that support an association with her left shoulder pain, and I therefore will consider these complaints to some *minor* degree in awarding damages in this case.

Then, by June 2021, when Petitioner sought care with a new orthopedic surgeon due to ongoing left shoulder symptoms that *she* linked to her receipt of a "flu shot which aggravated her shoulder symptoms[,]" this orthopedist assessed Petitioner with "left shoulder advanced posttraumatic [OA]." Ex. 4 at 8-11. A CT performed in late June of 2021 confirmed that Petitioner had "advanced degenerative changes about the glenohumeral joint." Ex. 2 at 3948. As a result of these degenerative findings and ongoing symptoms, Petitioner's July 22, 2021 surgery consisted of a left shoulder reverse arthroplasty and biceps tenodesis, which provided *some* relief. Ex. 2 at 3888-91. By November 2021, Petitioner was discharged from post-surgical PT to a home exercise program after canceling several visits and making improvements with motion and pain (though trigger points continued to cause her ongoing pain). Ex. 4 at 82. It thus appears more likely than not that Petitioner's vaccine-related injury was mostly resolved, though with lingering symptoms somewhat attributable to non-vaccine, degenerative causes, by the end of 2021.

This is not a case where a petitioner's second surgery or procedure was meant to address issues that were more attenuated or removed from the initial shoulder injury, so that I may more easily parse out which treatment was truly vaccine-caused from that which was not. *See,* e.g., *Mullin v. Sec'y of Health & Hum. Servs.,* No. 23-940V, 2026 WL 838007 (Fed. Cl. Spec. Mstr. Feb. 17, 2026) (addressing the petitioner's surgeries and noting the second procedure (an open biceps tenodesis) and affiliated treatment relating to a biceps "bulge" was less likely to be connected to the original vaccine injury, but still concluding the injuries were difficult to distinguish). Rather, Petitioner's second surgery herein was meant to address ongoing left shoulder symptoms. Although a total reverse arthroplasty (shoulder replacement) surgery is a step away from what is seen in typical SIRVA Program claims, as it commonly would relate to amelioration of degenerative changes, it is not so removed or attenuated here to say it was completely unrelated to Petitioner's original vaccine injury.

It is often the case in SIRVA claims for the vaccine to trigger certain underlying comorbidities, causing them to come to the surface where they were previously asymptomatic. This appears to have been the case here, with Petitioner's second surgery, a reverse arthroplasty, mostly to address Petitioner's concomitant OA and degenerative changes. *See,* e.g., Ex. 4 at 8-11. But I am unable to find that the vaccine did not "kick off" such pre-existing changes and lead to manifestation of these degenerative changes, especially since it is well-documented that Petitioner did not suffer from any pre-existing symptoms in the left shoulder in the three years prior to her receipt of the subject vaccination. *See,* e.g., Respondent's Report, ECF No. 28 (conceding entitlement and finding the QAIs met, including that there was no history of symptoms in the vaccinated shoulder). And Petitioner's treaters noted that the vaccine event likely led to her aggravation of shoulder symptoms. *See,* e.g., Ex. 3 at 505. It is thus extremely difficult in this case to parse out Petitioner's second surgery (and ensuing treatment) from her original injury, as Respondent urges. Nonetheless, I find that the record supports a vaccine injury that over time became less related to her ongoing symptoms, which could more directly be attributed to her comorbid degenerative changes.

I will note, however, that although this conclusion somewhat mirrors the conclusion put forth by the independent medical examiner in February 2021,[5] I am not much relying on this individual's opinion in informing my decision herein. Petitioner reasonably argues that this treater had little direct knowledge of Petitioner's physical circumstances, as he did not personally examine Petitioner. More than that, this treater was retained in pursuit of discrediting Petitioner's worker's compensation claim. This opinion is consistent with

[5] *See* Ex. 2 at 1442 (Petitioner's "flu injection caused the subacromial bursitis, which did not alter the natural history of the degeneration of a severe nature of the left glenohumeral joint. The need for left total shoulder arthroplasty is due to the pre-existing severe degenerative arthrosis of the left shoulder." Petitioner was a candidate for a shoulder replacement independent of her SIRVA).

other contemporaneous medical records that corroborate Petitioner's degenerative findings as being more responsible for her ongoing left (and later right) shoulder symptoms (i.e., Petitioner's June 2021 CT results, Ex. 2 at 3948).

Added support for the fact that Petitioner's vaccine-associated injury had mostly resolved by late 2021 comes from the fact that by June 2023, Petitioner began reporting *right* shoulder symptoms, with a right shoulder x-ray showing mild acromioclavicular joint arthritis and a left shoulder x-ray being normal. Ex. 7 at 1-2. She thereafter complained of symptoms similar to those experienced on the left side (i.e., pain and restricted range of motion), and she received treatment specific to the right shoulder, including steroid injections. *See id.*; *see also* Ex. 9 at 5, 9-10. And, though she later began complaining of left shoulder symptoms again (in November 2024), Petitioner's treaters could not find a source of infection (stemming from her shoulder replacement surgery) or a "specific reason for [her] [shoulder] symptoms" by that time. Ex. 9 at 26-28, 42, 61-62, 68. Despite Petitioner's treater's recommendation for a possible third surgery to alleviate Petitioner's ongoing symptoms reported in January 2025, the record does not contain evidence that the ongoing symptoms were related to her original 2019 injury, or that she returned to care for further treatment.

It thus is not clear that Petitioner's ongoing shoulder injury and replacement (and therefore her second surgery and affiliated treatment) is wholly related to her SIRVA. Still, because it is an incredibly difficult task to separate out Petitioner's true and ongoing vaccine-injury from her degenerative changes in this case, I will award more in past pain and suffering than I would have if I fully found the second procedure to be distinguishable.

Petitioner relies on her 17% partial permanent disability rating (assessed in June 2021) to argue that her vaccine injury was, in fact, permanent. But it appears that Petitioner personally sought out this assessment in connection with her worker's compensation claim, and thus this evaluation was likely for insurance purposes in connection with obtaining clearance for her second surgery (discrediting it somewhat in the same way the medical examiner's one-sided view has been challenged). Ex. 3 at 653. Petitioner relies on this rating as added support for a higher *past* pain and suffering award (versus a future component),[6] but it only adds support for the conclusion that Petitioner's past/actual pain and suffering was higher than usual.

[6] During the expedited damages hearing in this matter, Petitioner reiterated her assertion that her partial permanent disability rating supported a higher *past* pain and suffering award herein, rather than a true future pain and suffering award. Alternatively, in her Reply brief, Petitioner also argued that if I found a $235,000.00 past pain and suffering award to be inappropriate, I should fashion a significant future pain and suffering award. Reply at 5. In this case, I do not include any component of damages for future pain and suffering, and I will only briefly address this element in light of Petitioner's differing requests on this issue. I will note, however, that such an award is appropriate "only for cases where a strong showing is made that the claimant has suffered a *permanent* disability, or there are other extenuating circumstances that justify inclusion of a future component." *Accetta v. Sec'y of Health & Hum. Servs.*, No. 17-1731V, 2021

In her briefings and during the damages hearing, Petitioner cites to a number of damages decisions involving SIRVAs, highlighting the similarities between the petitioners in those cases and Ms. Wunsch. Br. at 28-29.[7] Petitioner argues that an award of $235,000.00 is appropriate in this case. *Id.* at 1. Petitioner bases this request on her two surgeries that provided "little relief" (and thus resulted in a recommendation for a third surgery), five steroid injections, prescription medication, several rounds of PT, resulting in persistent pain, restricted motion, and a permanent disability that impacts her quality of life. *See id.* at 29. Respondent, on the other hand, proposes an award ranging from $91,000.00 - $110,000.00 for Petitioner's treatment over a 16-month course that was significant and involved surgery plus prompt reporting of pain. Resp. at 14. He thus compares the facts of Petitioner's circumstances favorably to a number of less severe SIRVA cases.[8] *See id.*

As noted during the expedited damages hearing in this matter, Respondent's cited comparable cases are much too low to adequately compensate Petitioner for her pain and suffering. An award in Respondent's proffered range would be appropriate for an injury that may have been severe enough to require surgery but that completely resolved soon thereafter. *See,* e.g., *Weed v. Sec'y of Health & Hum. Servs.,* No. 18-1473V, 2021 WL 1711800 (Fed. Cl. Spec. Mstr. Mar. 30, 2021) (awarding $105,000.00 for pain and suffering to a petitioner that sought treatment within one week of vaccination, underwent nine PT sessions and surgery, but who experienced a fairly complete recovery). The

---

WL 1718202, at *5 (Fed. Cl. Spec. Mstr. Mar. 31, 2021). Special masters have previously declined to award a future pain and suffering award in the absence of substantial indicia of permanency. *See,* e.g., *Reed v. Sec'y of Health & Hum. Servs.,* No. 16-1670V, 2019 WL 1222925, at *17 (Fed. Cl. Spec. Mstr. Feb. 1, 2019) (noting there should be "adequate medical evidence demonstrating the likelihood that petitioner's [] injury, more likely than not, will extend well into the future and . . . indicating that [an] injury is permanent"). While Petitioner here indeed had a noted 17% partial permanent disability rating, as discussed above, not all of Petitioner's later sequalae can be attributed to Petitioner's original vaccine injury sufficient to justify a future pain and suffering award.

[7] In particular, Petitioner cited to *Mulloy v. Sec'y of Health & Hum. Servs.,* No. 19-1396V, 2023 WL 2620653 (Fed. Cl. Spec. Mstr. Mar. 24, 2023) (awarding $205,000 for actual pain and suffering); *Meirndorf v. Sec'y of Health & Hum. Servs.,* No. 19-1876V, 2022 WL 1055475 (Fed. Cl. Spec. Mstr. Mar. 7, 2022) (awarding $200,000 for actual pain and suffering); *Lawson v. Sec'y of Health & Hum. Servs.*, No. 18-882V, 2021 WL 688560 (Fed. Cl. Spec. Mstr. Jan. 5, 2021) (awarding $205,000 for actual pain and suffering); and *McCarn v. Sec'y of Health & Hum. Servs.,* No. 20-1988V, 2025 WL 1891823 (Fed. Cl. Spec. Mstr. June 6, 2025) (awarding $210,000 for actual pain and suffering).

[8] Respondent cited to *Hunt v. Sec'y of Health & Hum. Servs.,* No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022) (awarding $95,000.00 for actual pain and suffering); *Felland v. Sec'y of Health & Hum. Servs.,* No. 20-406V, 2022 WL 10724100 (Fed. Cl. Spec. Mstr. Sept. 6, 2022) (awarding $100,000.00 for actual pain and suffering); *Weed v. Sec'y of Health & Hum. Servs.,* No. 18-1473V, 2021 WL 1711800 (Fed. Cl. Spec. Mstr. Mar. 30, 2021) (awarding $105,000.00 for actual pain and suffering); *Yodowitz v. Sec'y of Health & Hum. Servs.,* No. 21-370V, 2024 WL 4284926 (Fed. Cl. Spec. Mstr. Aug. 23, 2024) (awarding $110,000.00 for actual pain and suffering); and *Selling v. Sec'y of Health & Hum. Servs.,* No. 16-588V, 2019 WL 3425224 (Fed. Cl. Spec. Mstr. May 2, 2019) (awarding $105,000.00 for actual pain and suffering).

same facts are not present here in Ms. Wunsch's case. Instead, Petitioner experienced lingering (and at times worsening) symptoms following her first surgery, requiring significant treatment thereafter.

I find the comparable damages determinations offered by Petitioner to be helpful in providing a reasonable range of outcomes pertaining to the instant case. But Petitioner's circumstances do not warrant an award quite as high as her requested sum.[9] Comparatively, while Petitioner here experienced a severe injury, the cases she relied upon wherein an award above $200,000.00 was awarded involved petitioners with more aggressive treatment over longer durations.

For instance, the *Lawson* petitioner underwent one additional surgery compared to Petitioner in this case. *See* No. 18-882V, 2021 WL 688560 (Fed. Cl. Spec. Mstr. Jan. 5, 2021). In *Mulloy v. Sec'y of Health & Hum. Servs.*, the petitioner treated for over four years (thus double the length of Petitioner's treatment course attributable to the subject vaccination here), had four steroid injections, and underwent *more than 100* PT sessions, nearly quadruple the amount received by Ms. Wunsch. *See* No. 19-1396V, 2023 WL 2620653 (Fed. Cl. Spec. Mstr. Mar. 24, 2023). Likewise, the petitioner in *Meirndorf* received significantly more treatment, in that *Meirndorf* received three steroid injections, two joint injections, underwent 79 sessions of PT, plus five laser treatments and acupuncture. *See* No. 19-1876V, 2022 WL 1055475 (Fed. Cl. Spec. Mstr. Mar. 7, 2022). Petitioner is thus entitled to a lesser award than the awards exceeding $200,000.00 passed down in those cases.

Finally, while the petitioner's circumstances in *McCarn* most closely resemble those here (in that the *McCarn* petitioner experienced other comorbid conditions (i.e., axillary neuropathy), plus shoulder symptoms at the end of her treatment course, with a third surgery being contemplated at that time), *McCarn* experienced a more severe treatment course overall. *See* No. 20-1988V, 2025 WL 1891823 (Fed. Cl. Spec. Mstr. June 6, 2025). For instance, the *McCarn* petitioner attended dozens of PT sessions and received two injections over a period of over four years. *See id.* More importantly, the possibility of future care was less speculative in *McCarn* than compared to Petitioner here, as the recommendation for further care in *McCarn* was based on that petitioner's 57% permanent disability and was considered more closely attributable to her original vaccine injury. *See* 2025 WL 1891823, at *8-9.

Petitioner's submitted evidence establishes a severe and fairly aggressive course – resulting in lingering sequelae typically seen in SIRVA cases (pain, stiffness, restricted mobility, plus other unrelated residual symptoms), and real-life implications affecting her

[9] I will also note that in *none* of the cases Petitioner relied upon in support was her requested sum of $235,000.00 awarded in actual pain and suffering.

personal and emotional well-being, including affecting her activities of daily living and enjoyment of life. Petitioner is entitled to a significant award, if somewhat less than her requested sum.

Thus, pursuant to my oral ruling on June 26, 2026 (which is fully adopted herein), **I find that $175,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**

## CONCLUSION

In light of all of the above, I award **Petitioner a lump sum payment of $175,271.95 (representing compensation for actual pain and suffering and past unreimbursable expenses) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id*.

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[10]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.